**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DAVID SHINER**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13 C 5867 |
| | ) | |
| **BERNARD I. TURNOY**, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

David Shiner ("Shiner") brings this action pursuant to 26 U.S.C. § 7434 ("Section 7434"), asserting that Bernard Turnoy ("Turnoy") willfully filed a fraudulent income tax information return by transmitting a Form 1099-MISC ("1099") to the Internal Revenue Service ("IRS") that reported he had made a payment to Shiner in 2012 -- even though Shiner had never accepted such payment. More specifically, after Turnoy had entered into an agreement with Shiner to share equally the commissions generated by the sale of several life insurance policies, he then sent Shiner a check for an amount less than what Shiner claimed (and still claims) was due him. That check bore a restrictive endorsement stating that Shiner's acceptance would constitute full satisfaction of the disputed debt.

Shiner promptly filed an Illinois state court action against Turnoy and eventually returned the check, but by the time Turnoy was served with process and received the uncashed check he had already filed a 1099 with the IRS declaring that he had made a payment to Shiner in 2012. Shiner then brought this action, charging that the 1099 was false because he had never accepted a payment, so that Turnoy committed tax fraud under Section 7434 by the willful filing of a false

information return. Shiner and Turnoy have now filed cross-motions for summary judgment under Fed. R. Civ. P. ("Rule") 56.

At the outset it should be noted that Turnoy and Shiner have wasted a great deal of effort in their memoranda disputing how much Turnoy actually owed Shiner under their agreement (T. Mem. 5-7, 13-14; S. R. T. Mem. 5-7; S. Mem. 5; T. R. S. Mem. 4).[1] Both parties are still embroiled in their state court battle over the amount of commissions Turnoy owed Shiner, but this case focuses solely on whether the 1099 accurately reflected that Turnoy made a payment to Shiner in 2012 and whether Turnoy believed that the form was true when he filed it. Irrelevant to those questions is whether the amount Turnoy offered to Shiner satisfied -- or even whether Turnoy believed that it satisfied -- the underlying debt. Hence this opinion expresses no view on the amount of commissions due to Shiner under his agreement with Turnoy.

Here the undisputed material facts reveal that because of the restrictive endorsement that Turnoy chose to place on his check, (1) it did not qualify as a bona fide payment to Shiner and (2) Turnoy had no good faith basis to believe that he had made such a payment when he filed the 1099. By filing a form that purported to be true without actually believing it, Turnoy willfully filed a false information return in violation of Section 7434. Accordingly Shiner's motion for summary judgment is granted, and Turnoy's corresponding motion must be and is denied.

_____

[1] Abbreviations "S." for "Shiner" and "T." for "Turnoy" are used in citations throughout this opinion. Thus Shiner and Turnoy's memoranda in support of their respective motions for summary judgment are cited "S. Mem. --" and "T. Mem. --". Responses to those memoranda use the abbreviation of the memorandum to which they respond preceded by "x R.," with the "x" denoting the author of the response. Exhibits submitted by Shiner are cited "Ex. --," while Turnoy inexplicably gives identical designations to certain different exhibits (see n.3). Turnoy's LR 56.1(a)(3) statement in support of his motion for summary judgment is cited "T. St. ¶ --". When this opinion cites to Turnoy's statement of facts, any citation to Shiner's response is omitted if that response simply admits the alleged facts.

**Background**

Shiner and Turnoy -- both licensed producers of life insurance products -- entered into an agreement that Turnoy would pay Shiner one half of the commissions generated by the procurement of two life insurance policies that were ultimately issued in November 2012 (T. St. ¶¶ 1-3, 6). Turnoy said that he had received $298,119.81 in such commissions, but over weeks of increasingly heated correspondence Shiner insisted that the actual amount of commissions (and consequently his share) was significantly higher (T. St. ¶ 7). On December 13, 2012 Shiner sent Turnoy a demand letter, accompanied by a draft complaint for breach of contract, with the letter stating that he would sue if he did not receive additional documentation from Turnoy by December 17 verifying the amount of commissions that were to be divided (S. Ex. 18).[2] Turnoy responded on December 17 by sending a check to Shiner for $149,059.91, half of the $298,119.81 that Turnoy maintains he had received in commissions -- a check that read on the reverse side (at the place for endorsement) that "endorsement constitutes full & absolute release/hold-harmless by Shiner &/or all interested persons/parties; as per cover letter" (S. Ex. 20). Included with the check was a letter (S. Ex. 19) that said in relevant part:

> Enclosed you will find my check payable to you . . . in the sum of one-half (1/2) of the abovementioned gross commissions, same being $149,059.91. Accordingly, this sum will be reported and a corresponding 1099 generated indicating said.

> \*     \*     \*

---

[2] Shiner and Turnoy dispute a number of facts related to the commissions Turnoy received and the representations that he made to Shiner about them (T. St. ¶¶ 8-11; S. R. T. St. ¶¶ 8-11), but none of those disputes are material to the disposition of this case. For purposes of this opinion it suffices to find (and Turnoy cannot dispute) that Turnoy was fully aware, when he sent the check to Shiner, that he was offering less than the amount Shiner had said he was willing to accept.

> Your acceptance and the negotiation of the above referenced check [#8171] and payment to you thereby shall also serve as a full, complete and absolute release / hold-harmless from any obligations and/or all liabilities on my part. . . .

On the next day Shiner filed a lawsuit in the Circuit Court of Cook County, charging Turnoy with breach of contract (T. St. ¶ 13). Turnoy was not served until January 30, 2013 (S. Ex. 24 ¶ 6), and Shiner neither deposited nor negotiated the check. With Shiner's state action against Turnoy then pending (as it still is today), Shiner ultimately returned the check to Turnoy in August 2013 (T. Ex. B ¶ 4).

Turnoy told his accountant Michael Weisberg ("Weisberg") that he had sent Shiner a check for $149,059.91 in late December 2012 (T. Ex. B ¶ 4), but he did not inform Weisberg that Shiner disputed the amount of payment or that the check contained a restrictive endorsement (S. Ex. 25 ¶ 2). Weisberg advised Turnoy that pursuant to the Internal Revenue Code he was required to file a 1099 as to Shiner no later than January 31, 2013 (T. St. ¶¶ 14-15). At Turnoy's direction Weisberg then prepared and filed a 1099 in the amount of $149,059.91, and he sent a copy to Shiner on January 25, 2013 (id.). Turnoy maintained sufficient funds in his bank account to cover the check until late February 2013 (T. R. Ex. A ¶ 4).[3] Shiner brought this

---

[3] As n.1 has foreshadowed, the "R." in the text's citation denotes a Turnoy exhibit attached to his responsive memorandum. To turn to the possible substantive significance of what has just been said in the text, Shiner attempts to show that Turnoy never believed Shiner would accept the check by pointing to the fact that in late February 2013 Turnoy's bank account balance fell below the $149,059.91 figure needed to cover the check (S. Mem. 8-9). Although Turnoy's account activity in that regard may evidence the belief that he held in February, he was unquestionably already aware that Shiner had refused to accept his check by no later than January 30, the date on which he was served with Shiner's breach of contract complaint. But that does not ultimately help Shiner, for what is at issue here is what Turnoy believed when he filed the 1099 on January 25, 2013 -- before he received service of process in the state court lawsuit or made significant withdrawals from his bank account -- so that evidence of Turnoy's belief after January 25 cannot control. Nor can Shiner's attempt to use the fact that Turnoy has not corrected
(continued)

action in August 2013 charging (1) that the 1099 was false because Shiner never accepted the check and (2) that Turnoy violated Section 7434 by willfully filing an inaccurate information return.

## **Summary Judgment Standard**

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F. 3d 467, 471 (7th Cir. 2002)). Courts "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts" in resolving motions for summary judgment (Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists, and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

As with any summary judgment motion, this opinion accepts each nonmovant's version of any disputed facts, but only so long as it is supported by record evidence. Where as here cross-motions for summary judgment are involved, the principles of Rule 56 demand a dual perspective that this Court has sometimes described as Janus-like: As to each motion the

---

(footnote continued)
or withdrawn the 1099 be used to demonstrate Turnoy's bad faith (S. Mem. 8-9), for Turnoy's actions or inaction months after filing the 1099 do not necessarily establish his belief at the time he filed it in January 2013.

- 5 -

nonmovant's version of any disputed facts must be credited, a stance that sometimes causes the denial of both motions. But that potential for such a dual denial is not actualized here, for the underlying material facts are not in dispute.

## Accuracy of a 1099 Within the Meaning of Section 7434

Shiner filed suit here against Turnoy, asserting his liability under Section 7434(a):

> If any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return.

Section 7434 "creates a private right of action against anyone who 'willfully files a fraudulent information return with respect to payments purported to be made' to the plaintiff" (Cavoto v. Hayes, 634 F.3d 921, 923 (7th Cir. 2011) (per curiam). Shiner argues that the 1099 was false because Turnoy never actually paid Shiner the $149,059.91 in 2012 (S. Mem. 8-9). This Court agrees for reasons that are set out more fully below.

It is true that Shiner never cashed the check and ultimately returned it to Turnoy -- but checks are usually considered taxable income when received, regardless of whether they are actually cashed (Walter v. United States, 148 F.3d 1027, 1029 (8th Cir. 1998) and Kahler v. Comm'r, 18 T.C. 31, 34-35 (1952) are just two of the many cases so holding). Individuals who do not accept payment may still be in "constructive receipt" of the income as defined by Treas. Reg. § 1.451-2(a):

> Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions.

Shiner contends that the restrictive endorsement language placed on the check and the accompanying cover letter qualify as "substantial limitations or restrictions" (S. Mem. 7). In that respect he points to Treas. Reg. § 1.6041-1(h), which specifically defines when a payment is deemed to have been made in terms of an information return such as the 1099 at issue here:

> For purposes of a return of information, an amount is deemed to have been paid when it is credited or set apart to a person without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made, and is made available to him so that it may be drawn at any time, and its receipt brought within his own control and disposition.

Whether there is a condition upon which payment is to be made is essentially the same question as whether the creditor has the legal right to refuse to accept that payment (see Bones v. Comm'r, 4 T.C. 415, 420 (1944)). Normally creditors do not have the right to refuse or delay their acceptance of a check for tax purposes, and so they are in constructive receipt from the time they receive the check. When there is a dispute over the underlying debt for which a check purports to be in full satisfaction, however, the placement of a restrictive endorsement on that check imposes a condition upon its acceptance and gives the creditor a legal right to reject the condition by refusing the check. In such situations receiving a check with a restrictive endorsement does not constitute constructive receipt, and no payment will be considered as having been made unless and until the check is actually accepted.

Shiner's situation is directly analogous to that of the taxpayer in Bones, who refused to accept a check with a restrictive endorsement because he reasonably believed that doing so would compromise his legal position as to the underlying debt. Bones held that because there was a condition placed on the taxpayer's acceptance of the check, he had a legal right to refuse to accept it and was therefore not in constructive receipt of the payment (4 T.C. at 419-21). In the same way, when Turnoy included a restrictive endorsement on his check to Shiner he

transformed it from a simple payment into an <u>offer</u> of payment subject to a condition.  That being so, Turnoy would not actually have made the payment unless Shiner had affirmatively accepted that offer by negotiating the check -- which he did not do.

Turnoy seeks to rely on <u>Stoller v. Comm'r</u>, 46 T.C.M. (CCH) 345 (1983). in which a taxpayer who returned a check because it was not for as much as he believed was owed was found to be in constructive receipt of the payment because his refusal to accept the check was not "pursuant to a reasonable attempt to protect his legal position with respect to any further claims he may have had against" the check's issuer.  Despite finding that there was constructive receipt, in that situation, <u>Stoller</u> expressly relied on <u>Bones</u> to reconfirm that:

> where a taxpayer demonstrates that his acceptance of a check would compromise his legal posture with respect to a disputed claim, and he refuses to accept the check in a reasonable attempt to protect his legal position with respect to said claim, he will not be deemed to have constructively received the amount tendered and refused.

Unlike the taxpayer in <u>Stoller</u>, but just like the taxpayer in <u>Bones</u>, Shiner could not have accepted his check without jeopardizing his legal position as to the sum he demanded from Turnoy.[4]  And that being the case, Shiner was not in constructive receipt of payment from Turnoy in 2012.  Turnoy's 1099 reporting that he did pay Shiner was therefore false.

---

[4] <u>Stoller</u> also held that the check at issue in that case would have been constructively received even if it contained restrictive endorsement language because under New York law a party who endorses a check "without prejudice and under protest" reserved "the right to demand any balance which may be due, even though the check purports to represent final payment for services performed."  But under Illinois law, negotiating a check under protest makes no difference:  If a check is offered subject to a condition, the creditor must either accept the offer with the condition or refuse it -- the "creditor has no right to cash the check and thereby obtain the benefit of such offer without its accompanying burden of compromise" (<u>Quaintance Assocs., Inc. v. PLM, Inc.</u>, 95 Ill. App. 3d 818, 822, 420 N.E.2d 567, 570 (1st Dist. 1981)).

- 8 -

Turnoy attempts to analogize this case to Bailey v. Shell W. E&P, Inc., 1998 WL 185520 (N.D. Tex. 1998), aff'd without published opinion 170 F.3d 184 (5th Cir. 1999), where the defendant was found not to have violated Section 7434. While district court opinions do not of course create binding precedent, it is worth spending a moment to highlight the clear distinction between Bailey and this case. In Bailey the defendant miscalculated royalty payments that it had made to the plaintiff and filed information returns reporting the amounts that it actually paid rather the amounts that it owed. In finding that the defendant was not liable, Bailey at *2 (emphasis in original) held that Section 7434:

> does not ask whether the amount paid was actually the amount owed. Therefore, it cannot be said that Defendant, on its 1099 Forms, made any misrepresentations at all -- even if it could be shown that the royalties were calculated fraudulently. The filings declare only that certain payments were actually made, and it is undisputed that such information was accurate and truthful.

Turnoy properly cites Bailey for the proposition that the issue is not whether the amount he reported on the 1099 actually satisfied his underlying debt to Shiner but whether the form accurately reflected the payment he "actually made." But because, as this memorandum opinion has already established, Turnoy's check was not actually a payment to Shiner at all, the 1099 he filed declaring that he had made a payment for $149,059.91 was false.

**Willfulness in Filing a False 1099**

Filing an incorrect 1099 does not make Turnoy liable under Section 7434 unless he did so "willfully," which Vandenheede v. Vecchio, 541 F. App'x 577, 580 (6th Cir. 2013) held "in this context 'connotes a voluntary, intentional violation of a legal duty.'" Turnoy is liable under Section 7434 if he intentionally attempted to deceive the IRS by filing the 1099 without believing that it was true.

Even when all evidence is construed in the light most favorable to Turnoy, this Court finds no good faith basis on which he could have believed that he had paid Shiner at the time he filed the 1099. Turnoy then <u>knew</u> that Shiner disputed the amount of the commissions he was owed and had threatened legal action. When Turnoy placed the restrictive endorsement on the check "as an act of self-protection" (T. St. ¶ 12), he explicitly presented Shiner with the option either (1) to reject the proffered payment or (2) to compromise his legal position by accepting it. Turnoy's supposed good-faith belief that he made a payment to Shiner is totally at odds with the intended consequence of including a restricting endorsement: so that Shiner's voluntary acceptance of the proffered check would limit his ability to pursue a greater amount later.

Turnoy contends that he "at the very least had a good-faith belief that he satisfied his debt to Plaintiff with the Check" (T. Mem. 13). In other words, Turnoy takes the position that by sending a check containing a restrictive endorsement he was both making a payment and fully satisfying a disputed debt -- regardless of whether the check was accepted. That preposterous argument is no better than an attempt to have his proverbial cake and eat it too: conditioning the check by inserting a restrictive endorsement, thus expecting to use Shiner's acceptance of the check as protection from future liability, while simultaneously insisting that the check itself constituted payment to Shiner regardless of whether it was actually accepted.

It is particularly disturbing to note that Turnoy is a sophisticated businessman who studied law at Downing College of England's Cambridge University (S. Ex. 22) and who was (at the very least) knowledgeable enough to attach strings to Shiner's acceptance of the proffered payment by drafting a restrictive endorsement. How could Turnoy possibly have believed that merely sending the check to Shiner constituted full payment of a disputed debt when Turnoy himself added language to the check acknowledging Shiner's option to refuse it? What is more,

before filing the 1099 Turnoy neither checked his bank account nor made any other effort to ascertain whether Shiner had actually deposited the check.

Finally, Turnoy's attempt to escape liability by asserting that he filed the 1099 based on his accountant's advice is a nonstarter because he did not first disclose all of the relevant information to Weisman. Reliance on the advice of a tax advisor can establish good faith only if each factor of the three part test defined in <u>Neonatology Assocs., P.A., v. Comm'r</u>, 115 T.C. 43 at *99 (2000), aff'd 299 F.3d 221 (3d Cir. 2002), is met:

> 1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment.

On that score the facts that Turnoy's check to Shiner contained a restrictive endorsement and was never deposited would certainly have been relevant to any competent professional's assessment of whether Turnoy had made a payment in 2012 obliging him to file a 1099. So Turnoy's failure to furnish Weisman with that "necessary and accurate information" directly negates the second element of the <u>Neonatology</u> test.

Moreover, under Treas. Reg. § 1.6664-4(c)(1)(i) (emphasis added) a taxpayer cannot demonstrate good faith through reliance on an accountant's advice "if the taxpayer fails to disclose a fact that it knows, <u>or reasonably should know</u>, to be relevant to the proper tax treatment of an item." Even on the wholly improbable premise that Turnoy did not actually know that the restrictive endorsement he included with the check was relevant to the tax treatment of that payment, surely he <u>should</u> have known: Why include a restrictive endorsement in the first place if he did not know that it had at least some legal relevance? In sum, Turnoy cannot use his reliance on Weisman's advice to establish that he issued the 1099 in good faith.

## **Conclusion**

There are thus a host of reasons to compel the conclusion that Turnoy violated Section 7434 by willfully filing a false information return when he filed a 1099 reflecting that he had paid $149,059.91 to Shiner in 2012 when payment had not in fact been made and when he had no good-faith basis to believe that it had. Accordingly Shiner's motion for summary judgment is granted, while Turnoy's corresponding motion is denied.

Because Turnoy should not have filed any 1099 at all involving Shiner for the year 2012, it is necessary to discuss the procedure and timing for quantifying Shiner's recovery of damages that he suffered as a proximate result of Turnoy's filing of the fraudulent 1099. For that purpose a status hearing is set for 8:45 a.m. July 25, 2014.[5]

                                                                                       Milton I. Shadur
                                                                                       Senior United States District Judge

Date: July 11, 2014

---

[5] As a corollary of this opinion's holding, Turnoy necessarily underpaid his own 2012 income taxes. Because the IRS would have no knowledge of that underpayment without being apprised of this opinion, a copy is being transmitted to the Chicago office of that agency.